VILLAGE OF WILLOUGHBY HILLS ET AL., APPELLEES, *v.*
CORRIGAN ET AL., APPELLANTS.

---

[7] An eventuality which we do not expect will occur subsequent to our announcement of this decision.

40

(No. 70-764—Decided February 2, 1972.)

*Mr. Barry M. Byron,* director of law, and *Messrs. Baker, Byron & Hackenberg,* for appellees.

*Mr. John T. Corrigan,* prosecuting attorney, *Mr. A. M. Braun, Mr. Thomas P. Cyrus* and *Mr. Richard A. Goulder,* for appellants.

LEACH, J. The basic question presented by this appeal is whether R. C. Chapter 4563 is unconstitutional on its face.

In essence, such was the conclusion of the Court of Appeals. Such conclusion apparently is based upon the rationale that *all* "airport zoning regulations" adopted pursuant to the authority of R. C. 4563.03 *necessarily* result in an unconstitutional "taking" of private property without compensation, and that such would be true even in those cases where such "taking" resulted in no diminution of property value, and where, so far as airspace is concerned, there is no showing as to the particular property that there is any actual interference with any use which might be considered reasonably necessary for the full use and enjoyment of the land.

The trial court found, as a matter of fact, that the evidence did not show "an impairment of use or diminution in value" of the property of the plaintiffs Chongris. From an examination of the record, it appears that such finding of fact was in accordance with the evidence. The Chongris' property is located in a "Transitional Zone" (contiguous to an "Approach Zone") and, based on the height restriction of the zoning regulation for a "Transitional Zone" (one foot in elevation for each seven feet in horizontal distance), the evidence indicated that such property had an allowable height of 70 feet. The height restrictions of the Willoughby Hills zoning ordinances are 35 feet in a residential single family district. The claim by the Chongris' that the airport zoning regulations preclude them from erecting a TV "tower" or antenna (to receive more distant stations) is negated by the fact that their expressed desire was to erect such to a height of only 45 feet.

The Court of Appeals apparently did not dispute the actual findings of fact of the trial court, but instead took the approach that the "purpose'" sought to be served by

---

[7]The opinion states, *inter alia*:

"It is obviously the purpose of R. C. 4563.03 to provide what amounts to an air easement for approaching and leaving aircraft by interfering with the enjoyment and use of the land laying below."

such "airport zoning regulations" could not be done in the exercise of the "police power" but only by the application of "eminent domain principles."

We do not agree. Instead, we conclude that airport zoning regulations adopted in accordance with the provisions of R. C. Chapter 4563 and designed to reduce "airport hazards,"[8] may constitutionally be adopted as an exercise of the "police power" of this state, if such regulations are reasonably necessary to insure the safety of aircraft in landing and taking off and the safety of persons occupying or using the area and the security of property thereon.[9] When, however, it is shown that the enforcement of any such airport zoning regulation as to specific property will result in an unconstitutional "taking" of such property, a court may enjoin the operation of the airport zoning regulation as to such property, or may, whichever is more appropriate under the circumstances, direct the institution of eminent domain proceedings for the purpose of compensating the property owners for such "taking."

Applying these principles, and concluding, as did the trial court (but not discussed by the Court of Appeals), that R. C. Chapter 4563 is not, as applicable to the terri-

---

[8]R. C. 4563.01(B) reads:

"'Airport hazard' means any structure or object of natural growth or use of land within an airport hazard area which obstructs the air space required for the flight of aircraft in landing or taking off at any airport or is otherwise hazardous to such landing or taking off of aircraft."

[9]R. C. 4563.07 reads:

"All airport zoning regulations adopted under Sections 4563.01 to 4563.21, inclusive, of the Revised Code shall be reasonable, and none shall impose any requirement or restriction which is not reasonably necessary to insure the safety of aircraft in landing and taking off and the safety of persons occupying or using the area and the security of property thereon. In determining what regulations are necessary, each political subdivision or airport zoning board shall consider, among other things, the character of the flying operations expected to be conducted at the airport, the per cent of slope or grade customarily used in descent or ascent of the aircraft expected to use the airport with reference to their size, speed, and type, the nature of the terrain within the airport hazard area, the character of the neighborhood, and the uses to which the property to be zoned is put or is adaptable."

tory also lying within a municipal corporation, violative of the "home rule" provision of Section 3, Article XVIII of the Ohio Constitution, we reverse the judgment of the Court of Appeals and sustain the judgment of the trial court.

No attempt will be made herein to discuss in detail the many cases from other jurisdictions wherein comparable questions have been presented. Most have been digested in annotations in 90 L. Ed. 1218, and 77 A. L. R. 2d 1355 (and A. L. R. supplement thereto). We will, however, outline the basic considerations which lead to our conclusions, as heretofore stated.

It is asserted by appellee that, although designated by statute as airport "zoning" regulation, such "are not in any recognized sense of the word, zoning." Such argument is predicated principally upon a comparison of the purposes sought to be achieved by community zoning and those sought to be achieved by airport zoning regulations. While the purposes may be different, such difference does not impel a conclusion that "airport zoning regulations" may not be adopted as a part of the "police power." In our opinion, the power, or lack of power, to adopt such regulations under the "police power" of the state may not be determined by its nomenclature. Instead, the test is whether such regulations are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Euclid* v. *Ambler Realty Co.* (1926), 272 U. S. 365, 395, 71 L. Ed. 303.

In considering the constitutionality of any "zoning" regulations restricting to any degree the uses to which land may be put, there would appear to be a certain degree of "taking." The question of whether there be an *unconstitutional* "taking," however, involves consideration of the extent or degree to which the landowner's use of his land is limited, and, to an extent, a judicial balancing of the loss of use against the benefits to society thus obtained.

In our opinion, the principles stated by the United

States Supreme Court in *Euclid* are equally applicable here.[10]

This court, in *Pritz* v. *Messer* (1925), 112 Ohio St. 628, held, in paragraph one of the syllabus:

"Laws enacted in the proper exercise of the police power, which are reasonably necessary for the preservation of the public health, safety and morals, even though they result in the impairment of the full use of property by the owner thereof, do not constitute a 'taking of private property' within the meaning of the constitutional requirements as to making compensation for the taking of property for public use and as to the deprivation of property without due process of law."

Applying the principles of *Euclid* and *Pritz* to the instant case, we think it clear that R. C. Chapter 4563, and any airport zoning regulations adopted in compliance with the requirements thereof, are "laws enacted in the proper exercise of the police power"; that they have a "substantial relation" to the "public safety" and to the "general welfare."

In this case, there was no claim of frequent low flights over plaintiff's land as was involved in *United States* v. *Causby* (1946), 328 U. S. 256, 90 L. Ed. 1206, and *Griggs*

---

[10]The court, in *Euclid*, at page 386, stated:

"* * * Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. * * *

"The ordinance now under review and all similar laws and regulations must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. * * * Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality * * *."

v. *Allegheny County* (1962), 369 U. S. 84, 7 L. Ed. 2d 585. In those cases, the United States Supreme Court held that frequent low flights over private property may constitute a "taking" if the utility of the land is limited and a consequent diminution in value is suffered. The cases are premised upon the actual invasion of the air space above the land by frequent low flights. The same situation existed in the case of *State, ex rel. Royal,* v. *Columbus* (1965), 3 Ohio St. 2d 154. The syllabus in that case reads:

"There exists a 'taking' in a constitutional sense of private property for public use under Section 19, Article I of the Ohio Constitution, whenever airflights are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land."

We reaffirm the principle applied in the *Royal* case, but find that such principle has no application to the facts of this case.

Plaintiffs assert that the "zoning" cases have no application; that, regardless of whether a landowner has been "damaged," the public may not take "air rights" from the landowner and convert such "air rights" to "its own use." This assertion is premised principally upon language employed by the Supreme Court of Washington in *Ackerman* v. *Port of Seattle* (1960), 55 Wash. 2d 400, 408, 348 P. 2d 664, 77 A. L. R. 2d 1344: "When private property rights are actually destroyed through the governmental action, then police power rules are *usually* applicable. * * * But, when private property rights are taken from the individual and are conferred upon the public for public use, eminent domain principles are applicable."

That language from *Ackerman* was approved in *Hageman* v. *Bd. of Trustees* (1969), 20 Ohio App. 2d 12,[11] the case principally relied upon by the Court of Appeals herein.

---

[11] *Hageman* is factually distinguishable in that, there, the airport zoning regulations, in addition to regulating height, purported to regulate population density and concentrations of persons by limiting development to two residences per acre.

Conceding that the Cuyahoga County Airport Zoning Board may not, in the guize of zoning, "convert" to the "public use" the "air rights" of plaintiffs Chongris, the question presented is: What is the scope and dimension of their "air rights"? It is now well settled that the doctrine of the common law, that the ownership of land extends to the periphery of the universe, has no place in the modern world. *United States* v. *Causby, supra* (328 U. S. 256). The opinion in *Causby* states:

"The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. See *Hinman* v. *Pacific Air Transport,* 84 F. 2d 755."

Subsequent to *Causby,* the Congress in 1958 amended the definition of "navigable airspace" to read:

" 'Navigable airspace' means airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft." Section 1301, Title 49, U. S. Code (72 Stat. 739).

With reference to such change, the opinion in *Griggs* v. *Allegheny County, supra* (369 U. S. 84), at page 88, states:

" * * * But as we said in the *Causby* case, the use of land presupposes the use of some of the airspace above it. * * * Otherwise no home could be built, no tree planted, no fence constructed, no chimney erected. An invasion of the 'superadjacent airspace' will often 'affect the use of the surface of the land itself.' "

In the instant case, the "invasion" of the "superadjacent airspace" has not been shown to have affected either the present use or any reasonably foreseeable use of the land itself, and plaintiffs Chongris continue their use of the land.

From an examination of the *Hinman* case, we conclude that the words "can occupy or use" in connection with the land, employed in *Causby,* were not intended to imply that, without proof of any actual loss of use, a land-

owner may prohibit any use of the airspace above his land up to a point where it would be physically *possible* to use such, but where the probabilities of such a use would be remote. In *Hinman*, the court stated, at page 758:

"We own so much of the space above the ground as we can occupy or make use of, in connection with the enjoyment of our land. This right is not fixed. It varies with our varying needs and is coextensive with them. The owner of land owns as much of the space above him as he uses, but only so long as he uses it. All that lies beyond belongs to the world."

We conclude that the zoning regulations in question did not take from the plaintiffs Chongris any "airspace" now owned by them. Thus, the question of whether such a "taking" of "airspace" actually "owned" by a landowner would be a "constitutional taking," in the absence of the payment of compensation therefor, is not involved, and the cases cited by appellee which involve such an "unconstitutional taking" are distinguishable.[12]

In *Harrell's Candy Kitchen* v. *Sarasota-Manatee Airport Authority* (Fla. 1959), 111 So. 2d 439, the Supreme Court of Florida found that there was no unlawful "taking" of property by enforcement of the height limitations of an airport zoning regulation, where its enforcement would not deprive the owner of the beneficial use of his land. In that case, there was no showing of any depreciation in value. See, also, *Waring* v. *Peterson* (Fla. 1962), 137 So. 2d 268.

Even if we were to assume a depreciation of the value of the Chongris' property such as to constitute a "taking" of property without the requisite payment of compensa-

[12]See *Yara Engineering Corp.* v. *Newark* (1945), 132 N. J. L. 370, 40 A. 2d 559; *Ackerman* v. *Port of Seattle* (1960), 55 Wash. 2d 400, 348 P. 2d 684, 77 A. L. R. 1344; *Indiana Toll Road Comm.* v. *Jankovich* (1963), 244 Ind. 574, 193 N. E. 2d 237; *Roark* v. *Caldwell* (1964), 87 Idaho 557, 394 P. 2d 641; *Jackson Municipal Airport Authority* v. *Evans* (Miss. 1966), 191 So. 2d 126; and *Sneed* v. *Riverside* (1963), 218 Cal. App. 2d 205, 32 Cal. Rptr. 318.

tion, such would not necessarily result in an injunction against the enforcement of any airport zoning regulations as to their property as to permit the erection of structures without any regard to the safety of aircraft. Instead, under certain situations, a judicial solution to such problem would result in legal compulsion directed to the proper appropriating authority to compensate the landowner for such "taking."

In *State, ex rel. Royal,* v. *Columbus, supra* (3 Ohio St. 2d 154), we did not enjoin "taking"; we there ordered proceedings for appropriation. *Causby, Griggs* and *Ackerman* involved payment for the "taking"; not injunction to prevent the taking.[13]

We turn now to the contention of the original plaintiff, the village (now city) of Willoughby Hills. Although the Court of Appeals made no ruling thereon, the municipal corporation asserts that the trial judge erred in failing to hold that the "home rule" power under Section 3, Article XVIII of the Ohio Constitution, to "zone" gives it the "exclusive" right to "zone" within its territory; that, therefore, R. C. 4563.03 is unconstitutional to the extent that it purports to confer "zoning" authority on others. That section of the Constitution provides that: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

The Constitution does not preclude state action on matters of state concern, and we agree with the holding of the trial court that the safety and welfare of persons above and on the ground in the vicinity of modern day airports is a matter of state concern. Moreover, from an evidentiary standpoint, there was no showing that any of

---

[13]In some states compensation is determined in such cases without formal action to appropriate by a procedure referred to as "inverse condemnation." See, *e. g., Sneed* v. *County of Riverside, supra* (footnote 12); *Peacock* v. *Sacramento* (1969), 271 Cal. App. 2d 845, 77 Cal. Rptr. 391.

the airport zoning regulations in question would have the effect of nullifying any of the zoning ordinances of Willoughby Hills.

For the reasons heretofore stated, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

O'NEILL, C. J., SCHNEIDER, HERBERT, HOLMES, CORRIGAN and STERN, JJ., concur.

HOLMES, J., of the Tenth Appellate District, sitting for DUNCAN, J. JUDGE HOLMES of the Court of Appeals was, pursuant to Section 2 of Article IV of the Constitution of Ohio, duly directed by the Chief Justice "to sit with the justices of the Supreme Court in the place and stead of" JUSTICE DUNCAN and JUDGE HOLMES did so and heard and considered this cause prior to the resignation of JUSTICE DUNCAN on November 28, 1971.