# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2191

_____

Bruce Smith; JoAnne Smith; Walter Wunderlich; Victoria Wunderlich

*Plaintiffs - Appellees*

v.

ConocoPhillips Pipe Line Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 12, 2015
Filed: September 15, 2015

_____

Before MURPHY and SHEPHERD, Circuit Judges, and HARPOOL,[1] District
Judge.

_____

MURPHY, Circuit Judge.

Phillips 66 (Phillips) owns a petroleum products pipeline which runs through
the town of West Alton, Missouri. After a leak in the line was discovered in 1963,

_____

[1]The Honorable Douglas Harpool, United States District Judge for the Western
District of Missouri, sitting by designation.

its source was repaired, but the contamination at the leak site was not remediated. In 2002 contaminants from the leak were discovered in a family residence in West Alton. Phillips purchased and demolished this property as well as others affected by the leak. In cooperation with the Missouri Department of Natural Resources, Phillips fenced in the area around the leak site and set up monitoring wells to track any spread of pollutants. While groundwater under the property owned by Phillips is contaminated, the surrounding properties have tested clean.

This action was filed in 2011 on behalf of a putative class of nearby landowners alleging that the contaminated site is a nuisance. The district court certified the class on the theory that possible pockets of contamination exist within the identified area. Phillips appeals, and we reverse.

I.

West Alton is a small Missouri town with a population of some 500 people. To carry petroleum products an underground pipeline was constructed in 1930 by Ajax Pipeline Company. A part of it ran under West Alton. Ownership of the pipeline was later transferred to Cherokee Pipe Line Company, and it documented a leak along a pipeline section running beneath West Alton. An April 12, 1963 report by Cherokee stated that 100 barrels of leaded gasoline had leaked and none had been recovered. The report did not contain information on when the leaking had begun. After the report was issued, the leaking section of the pipeline was repaired. In 1974 Cherokee merged into Continental Pipe Line Company, a predecessor to defendant Phillips 66 Pipeline LLC.

In 2002 West Alton resident Don Ellebracht noticed a strong odor of petroleum in his home. He contacted Phillips about it, and the company sent a representative to investigate. Since West Alton has no municipal water, well water is used by the households. Testing was performed on the Ellebracht well which showed the

presence of the toxic chemical benzene, a gasoline additive and carcinogen. The concentration of the chemical was three times greater than allowable limits. Phillips thereafter purchased the Ellebracht property, as well as two nearby family homes.

After the discovery of benzene on these properties, Phillips began to work with the Missouri Department of Natural Resources (MDNR) on a voluntary remediation plan. The area around the Ellebracht home was identified as the epicenter of the contamination, and Phillips fenced it in. In 2006 Phillips demolished the homes on the contaminated properties it had purchased and removed approximately 4000 cubic yards of that soil. After consulting with the MDNR, Phillips also set up monitoring wells to test for the presence of chemicals of concern (COCs) in the area's groundwater. The identified COCs included benzene, toluene, ethyl benzene, and xylenes (collectively referred to as BTEX), and lead. Inside the fenced contamination area in West Alton are thirteen monitoring wells which track pollutants; eight monitoring wells are located outside the fence.

During its discussions with MDNR in 2002, Phillips volunteered to provide precautionary bottled water for household use for approximately 50 residents near the contamination site. At that time sampling of the homeowner wells had not shown COCs above allowable limits. In 2007 Phillips corresponded with MDNR about discontinuing its supply of bottled water, which by then was only provided to 25 households. MDNR requested that Phillips test the wells of each family receiving bottled water for COCs before ending its water supply program. Phillips chose instead to continue its distribution of bottled water. Most of the families receiving water live within 0.25 miles of the contamination site; the most distant is 1.1 miles away.

II.

Walter and Vicki Wunderlich and Bruce and JoAnne Smith filed this class action against Phillips in Missouri county court in October 2011, and Phillips

removed the case to federal court the next month. Plaintiffs' complaint identified two separate classes, each including property owners within a 1.1 mile radius of the contamination site. The first class sought injunctive relief and damages on nuisance and negligence theories. This class alleged that Phillips had undertaken unreasonable uses of its land which diminished its property value by storing contaminants on site where they had leaked, fencing in that area with posted warning signs, and distributing drinking water instead of regularly testing neighboring wells and remediating the contamination. The class sought money damages for the diminution in property values and injunctive relief requiring Phillips to rid the area of leaked petroleum products and to conduct testing for soil and water contamination on nearby properties. The second proposed class sought compensation for ongoing expenses of medical monitoring due to potential exposure to pollutants from the pipeline leak.

The named class representatives were Walter and Vicki Wunderlich and Bruce and JoAnne Smith. The Smith house is 125 feet from the epicenter Ellebracht property, which is about 0.25 miles from the Wunderlichs. Both families began to purchase bottled water for home use in the 1990s. The Wunderlichs testified that an oily sheen was visible in their water; and the Smiths saw black flecks in theirs. The class representatives also testified that their property value has decreased as a result of the contamination.

The class plaintiffs presented evidence by two experts. The expert most relevant here is Dr. Patrick Agostino who earned a Ph.D in geology. Dr. Agostino explained that leaked contamination is pulled downward by gravity and spreads out, thus shifting over time. According to his testimony, the contamination in West Alton spread both to the north and south of the leak site (up-gradient and down-gradient); it was then pulled downward until it reached the water table and contaminated the groundwater. Based on his analysis, Dr. Agostino concluded that the resulting plume of contamination was "considerably larger" in the past than in 2013 and that it would therefore have affected other properties outside the contamination site. He did not offer an opinion on which of the surrounding properties could have been affected by

-4-

the historical plume nor on the number or identity of West Alton residents who are presently exposed to benzene, lead, or other COCs. Dr. Agostino also pointed out that some properties which are down-gradient of the leak site face a threat of contaminated drinking water, but he was unable to predict whether existing contamination would migrate further.

Phillips' expert was Phil Harvey, the project manager overseeing the company's remediation effort. Harvey explained that Phillips is using a process of monitored natural attenuation, by which biodegredation and other processes reduce the concentration of pollutants in soil and groundwater over time. This process is monitored by periodic testing of the wells inside and outside of the contamination site; it has been approved by the MDNR. Harvey testified that he had not made a determination about how long the natural attenuation process would take to remediate the contamination site. His view was different from that of Dr. Agostino who testified that more aggressive remediation techniques, such as "pump and treat" or vapor extraction, would remediate the contamination site more effectively and quickly than natural attenuation.

Discovery also included sampling of the contamination site and nearby properties. Of the thirteen wells on the remediation site, the highest benzene contamination sampled in 2002 was 13,000 micrograms per liter (ug/L), which by 2008 had fallen to 10,800 ug/L. In contrast, the highest concentration sampled in monitoring wells outside of the site was 1.4 ug/L in 2012, (below the cleanup threshold set by the MDNR of 5 ug/L). The plaintiffs claim however that the remediation effort has been ineffective, pointing to evidence that the most heavily contaminated monitoring well outside of the Phillips property was sampled at less than 1 ug/L in 2010 but had increased to 1.4 ug/L by 2012. They also note that the highest on site concentration of BTEX increased from 18,000 ug/L in 2002 to 18,667 ug/L in 2008.

Plaintiffs conducted testing in 2011 of drinking water on eleven nearby properties, including those belonging to class representatives Smiths and Wunderlichs. In those tests no BTEX was sampled above detectable levels. While the Smith property showed no contaminants, the Wunderlich property and one other showed methyl tertiary butyl ether (MTBE) in a concentration below laboratory reporting limits. MTBE is an additive to modern gasoline and diesel fuel. Phillips conducted further testing of the contamination site for MTBE in 2002, and none was detected.

The district court ruled on a number of motions in the case at the end of March in 2014. In their motion to certify the class plaintiffs modified the proposed class boundaries to include property owners within 0.25 miles of the site, an area containing 61 properties. Defendant moved to exclude the opinions of plaintiffs' experts.

The district court certified the class seeking nuisance based damages and injunctive relief. In its certification order the court relied on evidence that contaminants had been shown in the monitoring wells, that the pollution was continually shifting, and that MTBE had been discovered at the Wunderlich residence which is located roughly 0.25 miles away from the epicenter of the contamination. The court concluded that this was sufficient preliminary evidence of contamination to certify a class action with focus on the circular 0.25 mile area surrounding the contamination site. It also observed that it could not "rule out the possibility that pockets of contamination exist." The district court did not certify the medical monitoring class, noting that plaintiffs had offered no evidence of actual exposure to benzene or lead. The motion by Phillips to disqualify the experts offered by the class was denied.

Phillips now appeals the certification[2] of the class and the denial of its motion to disqualify plaintiffs' experts.

## III.

The district court has "broad discretion to decide whether certification is appropriate." Prof. Firefighters Ass'n of Omaha, Local 385 v. Zalewski, 678 F.3d 640, 645 (8th Cir. 2012) (internal quotation marks omitted). We will nonetheless reverse a certification where there has been an abuse of discretion or an error of law. In re Zurn Pex Plumbing Products Liab. Litig., 644 F.3d 604, 616 (8th Cir. 2011). In order to certify a class the district court must determine that it meets the "four threshold requirements" of Rule 23(a), often referred to as numerosity, commonality, typicality, and adequacy of representation, and one of the three subsections of Rule 23(b). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613–15 (1997). Here the district court certified both a Rule 23(b)(2) class for possible injunctive relief and a Rule 23(b)(3) class for possible money damages. Supreme Court precedent requires district courts to undertake a "rigorous analysis" to ensure that all requirements of Rule 23 have been met. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted).

Plaintiffs base their action against Phillips on its alleged violation of the Missouri state law torts of nuisance and negligence. In deciding matters of state law, "we are bound by the decisions of the state's highest court." Eichenwald v. Small, 321 F.3d 733, 736 (8th Cir. 2003). Nuisance under Missouri law is "the unreasonable, unusual, or unnatural use of one's property so that it substantially

---

[2]Phillips asks that before reaching the issue of class certification we require a full and conclusive district court inquiry under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and that we abandon the rule adopted in In re Zurn Pex Plumbing Products Liability Litigation, 644 F.3d 604, 614 (8th Cir. 2011) (requiring only a "focused Daubert analysis"). Zurn is a binding and well decided precedent which we need not revisit here.

impairs the right of another to peacefully enjoy his property." Frank v. Envtl. Sanitation Mgmt., Inc., 687 S.W.2d 876, 880 (Mo. 1985). The focus in a nuisance case "is defendant's unreasonable interference with the use and enjoyment of plaintiff's land." Id. at 880. The Missouri Supreme Court has also observed that "[t]here is no exact rule or formula by which the existence of a nuisance or the nonexistence of a nuisance may be determined," with each case depending upon its own "special circumstances." Id. at 881, quoting Crutcher v. Taystee Bread Co., 174 S.W.2d 801 (Mo. 1943).

To show the Rule 23 requirement of commonality, the plaintiff must "demonstrate that the class members have suffered the same injury." Dukes, 131 S. Ct. at 2551 (internal quotation marks omitted). Phillips argues that the lack of proof of contamination spread throughout the class land shows there is no classwide injury. Absent the injury of actual contamination, it argues, plaintiffs cannot meet the Rule 23 requirements of commonality or typicality. In certifying the class, the district court observed that some contamination had reached 0.25 miles from the contamination site, referring to a low level concentration of MTBE that had been discovered on the Wunderlichs land. As testing shows, however, and as plaintiffs' expert Dr. Agostino acknowledged, MTBE was not a chemical found at the Phillips contamination site. The primary COCs identified from the spill are benzene, BTEX, and lead, and these chemicals have not been shown to be on land owned by the class members. The presence on only one property of a petroleum pollutant not found at the leak site cannot prove that actual contamination exists on the class land. Plaintiffs nevertheless argue that their nuisance claim does not depend on a showing of actual physical invasion, for the presence of contaminants on one class site creates a "cloud on the class' land" and diminishes its property value.

A number of other courts have addressed the significant question of whether nuisance law requires a physical invasion onto property. While applying the nuisance law of Virginia, the Fourth Circuit questioned "whether property owners may recover for the diminution in the value of their property and their reasonable fear of negative

-8-

health effects resulting from the proximity of their property to an environmental hazard such as an underground oil spill." Adams v. Star Enter., 51 F.3d 417, 421–22 (4th Cir. 1995). In Adams, the court decided that concerns that environmental contamination might spread and cause property values to decrease were not enough to overcome the legal requirement that a nuisance be visible or "capable of physical detection from the plaintiff's property." Id. at 422, 423. Similarly, in a case involving dumping of manufacturing waste materials, the Fifth Circuit concluded in applying Mississippi law that the evidence "failed to show harmful levels of any toxic or hazardous substance in the [plaintiff's] well water." Berry v. Armstrong Rubber Co., 989 F.2d 822, 828–29 (5th Cir. 1993). The plaintiffs could not show any invasion of their property entitling them to recovery on their nuisance claim. Id. at 829.

Numerous state supreme courts have interpreted common law nuisance in a similar manner as in the cited federal cases. In Adkins v. Thomas Solvent Co., the Michigan Supreme Court held that plaintiffs seeking "[c]ompensation for a decline in property value caused by unfounded perception of underground contamination" had not made out a nuisance claim under state law. 487 N.W.2d 715, 717 (Mich. 1992). Like the plaintiffs in the case now before our court, the Adkins plaintiffs had not shown contamination of their own well water. The Michigan court concluded that "negative publicity resulting in unfounded fear about dangers in the vicinity of the property does not constitute a significant interference with the use and enjoyment of land." Id. at 721. Other state courts have reached similar conclusions. See Smith v. Kan. Gas Serv. Co., 169 P.3d 1052 (Kan. 2007) (fact that leaked pollutant had not physically interfered with or injured plaintiffs' land prevented recovery on nuisance or negligence claims under Kansas law); Walker Drug Co., Inc. v. La Sal Oil Co., 972 P.2d 1238, 1244 (Utah 1998) (holding under Utah law that "unsubstantiated fears of third persons regarding the contamination of an adjacent property are not the kind of 'substantial' and 'significant' interference with a landowner's use and enjoyment of his property so as to allow recovery for nuisance") (emphasis in original); Chance v. BP Chem., Inc., 670 N.E.2d 985, 990 (Ohio 1996) (affirming denial of nuisance claim

under Ohio law where plaintiffs presented only "speculative opinion testimony that problems may arise in the future" as a result of deepwell disposal of waste).

Plaintiffs respond that the governing Missouri law does not require a showing of physical invasion in order to state a claim for common law nuisance. They cite examples from some old decisions of the Missouri Supreme Court, Clutter v. Blankenship, 144 S.W.2d 119 (Mo. 1940) and Hayden v. Tucker, 37 Mo. 214 (Mo. 1866). In Clutter, the Missouri court decided that maintaining a funeral home in a purely residential neighborhood was a nuisance, affirming an injunction against the establishment. 144 S.W.2d at 966. The court commented that the constant reminder of death would "tend to destroy the comfort, well-being, and the property rights of the owners of homes' in the neighborhood." Id. at 965 (citation omitted). Previously in an 1866 case, the Missouri Supreme Court had concluded that the breeding of horses close to the plaintiff's home was "a revolting nuisance." Hayden, 37 Mo. at 224. Neither case identified any particular elements of state nuisance law, and the Missouri Supreme Court has subsequently instructed that nuisance is not a subject for formulaic determination but rather is dependent on the factual circumstances of each case, see Frank 687 S.W.2d at 881.

A similar argument to that raised by the plaintiffs here was rejected by the Fourth Circuit in Adams where landowners had claimed that nuisance law did not require a physical invasion of their property, and cited a case in which the Virginia Supreme Court had enjoined a landowner from storing junked automobiles on his property. 51 F.3d at 422. In rejecting the landowners' argument, the Adams court observed that the unsightly automobiles were visible from the neighboring properties, yet the underground oil spill the plaintiffs feared for endangering their property was "incapable of detection." Id. at 422–23. That is the same type of situation in the case now before our court. Missouri nuisance law also focuses on the claimed "interference with the use and enjoyment of plaintiff's land." Frank, 687 S.W.2d at 880. While these plaintiffs are concerned about the possibility of contamination

-10-

reaching their properties and harming them, the discovery and testing which has been conducted in the class area has not shown those fears to be substantiated.

In light of the contemporary consensus reached by persuasive authority on the meaning of common law nuisance in the context of environmental contamination, we conclude that the putative class fear of contamination spreading from the West Alton leak site to harm their property is not a sufficient injury to support a claim for common law nuisance in the absence of proof. See Adams 51 F.3d at 423.

IV.

Since it was an abuse of discretion to certify a class in the absence of evidence showing class members were commonly affected by contamination on their property, we reverse the class certification order by the district court and remand for further proceedings not inconsistent with this opinion.

_____