HENRY F. TWITTY AND WILLIAM TWITTY v. STATE OF NORTH CAROLINA AND HEMAN R. CLARK, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF CRIME CONTROL AND PUBLIC SAFETY

No. 869SC949

(Filed 7 April 1987)

1. **Nuisance §§ 1, 8— PCBs landfill disposal facility—no nuisance**
There was no evidence to support plaintiffs' recovery on the basis of nuisance, public or private, for the State's operation of a PCBs landfill disposal facility.

2. **Eminent Domain §§ 2, 13— PCBs landfill disposal facility—diminution in market value—no taking**
In an inverse condemnation action where plaintiffs alleged a taking of their property as a result of the State's construction and operation of a PCBs landfill disposal facility, plaintiffs were required to show that the location and the operation of the facility combined to constitute an actual interference with the use and enjoyment of their property, and a showing only of diminution in market value was insufficient to show a taking.

APPEAL by defendant from *Hobgood, Judge*. Judgment entered 17 June 1986 in Superior Court, FRANKLIN County. Heard in the Court of Appeals 4 February 1987.

This is an inverse condemnation action for an alleged taking of plaintiffs' property as a result of the State's construction and operation of a landfill disposal facility for the storage of soil con-

Twitty v. State

taminated by the toxic chemical polychlorinated biphenyls (referred to hereinafter as PCBs). This action was dismissed as to defendant Heman R. Clark, former Secretary of the North Carolina Department of Crime Control and Public Safety.

Plaintiffs own 775 acres of land in Warren County consisting of six separate tracts, three of which are owned individually by plaintiff Henry Twitty and three of which are owned jointly by both plaintiffs. In their complaint, plaintiffs allege that they have been deprived of their property without just compensation in violation of Article 1, Section 19, of the North Carolina Constitution and the Fourteenth Amendment of the United States Constitution suffering damage by the diminution in value of their property in the amount of $786,940.00.

Defendant moved for summary judgment and alternatively for an order removing the action to an adjacent county on the ground that defendant could not obtain a fair and impartial jury trial in Warren County. The trial court denied defendant's motion for summary judgment but removed the action to Franklin County. On 14 January 1986 defendant filed a motion requesting the trial court to determine all issues except compensation and to direct the preparation of a court-ordered survey. The issues are:

(1) Has there been a taking of any of plaintiffs' lands, or any interest therein, for which plaintiffs, or either of them, may be entitled to recover just compensation?

(2) If so, when did the taking(s) occur?

(3) Has there been a taking with regard to all of the lots (tracts) or only as to some of said lots (tracts)?

(4) If the Court determines there has been a taking, which of the six lots (tracts) should be joined or considered together for the purpose of assessing damages, if any, in this action?

(5) What interest, if any, has been taken in plaintiffs' lands?

The essential facts, as found by the trial court, are as follows:

During the summer of 1978 many miles of roadside in North Carolina were saturated by a liquid waste containing PCBs. Fed-

eral EPA regulations required disposal of PCBs either in a well-designed, monitored landfill or by incineration. There were no EPA approved incinerators in the United States at that time. As an alternative to landfill disposal, the State considered the possibility of in-place treatment. However, the EPA recommended against in-place treatment and the State began to look for a suitable landfill site. In the face of severe opposition by both local government officials and state residents, the State formally petitioned the EPA to reconsider its position against in-place treatment. On 4 June 1979 the EPA formally denied the State's petition and the State resumed its search for a landfill site.

The State acquired a 142.3-acre tract of land in Warren County. In accordance with federal regulations, the State applied for and received EPA approval of the site. In late 1979, a draft Environmental Impact Statement (EIS) was filed covering the Warren County site. A final EIS was filed in November 1980, but use of the site was delayed by litigation, including an earlier action instituted by the plaintiffs. On 21 May 1982 the EPA issued a "Finding of No Significant Impact." The landfill was constructed by the State and storage of the contaminated soil was completed in the latter part of 1982.

Prior to construction of the disposal facility, the State conveyed the 142.3-acre tract to Warren County, with the exception of 19.317 acres where the landfill facility is actually situated. The State also retained an access easement, a stream monitoring easement and a temporary construction easement. The county's use of the tract surrounding the 19.317 acres was restricted so that the tract would serve as a buffer zone between the landfill and adjacent properties. All residential, commercial, industrial, institutional, recreational, agricultural or any other temporary, periodic, regular or occasional human use or occupancy were prohibited unless approved by the Governor and Council of State as being consistent with the use of the property as a buffer zone.

In addition, restrictive covenants limit the State's use of the 19.317-acre landfill facility. The covenants and restrictions provide that no other hazardous waste as defined in G.S. 130-166.16(4) and no radioactive waste or materials as defined in G.S. 104E-5(9a) and G.S. 104E-5(14) may be placed upon or disposed of or stored on the landfill parcel. Further, except for necessary activities

relating to safe storage and disposal of the EPA approved PCBs material, no other hazardous or radioactive waste management activities may be engaged in on the 19.317-acre tract.

The plaintiffs, Henry and William Twitty, are father and son. Their 775-acre tract of land is adjacent to Richneck Creek and adjoins the north and northeastern portions of the buffer zone conveyed to Warren County. The six tracts of land are identified as Lot 19 (62.5 acres), Lot 20 (356.5 acres), Lot 21 (176 acres), Lot 22 (21 acres), Lot 23 (87 acres) and Lot 24 (54 acres) on Warren County Tax Map E-7. Lots 19, 21 and 22 are owned individually by Henry Twitty. Lots 20, 23 and 24 are owned jointly by the plaintiffs. Only Lots 19, 21 and 24 actually border Richneck Creek. The six tracts are contiguous and have traditionally been utilized as one operating farm for agricultural purposes. The trial court found both "physical unity" and "unity of use" with respect to these six tracts.

The area surrounding the landfill facility is basically rural and agricultural in nature. Warrenton is located three and one-half miles to the north and is the major shopping and labor market in the County. The area is somewhat isolated due to its agricultural use and lack of development. The tract upon which the landfill is located has no road frontage and access to the facility is by an easement extending approximately 1,675 feet to State Road 1604.

The disposal facility is situated on the crest of a hill. U.S. Geological Survey Flood Records establish that the one hundred year flood elevation is not more than eight feet above the average water level in Richneck Creek and its tributaries. The facility is approximately 80 feet above the level of Richneck Creek and is not subject to flooding. Based upon ground water elevation measurements made on 23 and 24 May 1985, there is a separation of 19 feet between the elevation of ground water beneath the landfill site and the PCBs waste material stored there. Surface water infiltration is minimized and surface water runoff is maximized by the topographic position of the landfill facility, the clay subsoils and side slopes of the ridge on which the landfill facility is located. Recharge of ground water resulting from surface water infiltration and percolation is low and there are no significant fluctuations in the water table elevations beneath the ridge oc-

cupied by the disposal facility. There are also seven natural draws located in a radial pattern around the fill site which enhance surface water drainage away from the facility.

The disposal facility was constructed in accordance with plans and specifications approved by the EPA. Artificial and compacted clay liners were constructed below the landfill and along side slopes to prevent hydraulic connection between ground water and the contaminated soil. Artificial and compacted clay liners were also placed on top of the landfill to prevent infiltration of rain and surface water. The compacted clay liner is five feet thick along the side slopes and bottom of the facility. The compacted clay liner is two feet thick over the top of the facility. In addition, there are ten mil thick artificial liners encasing the disposal facility which overlap and are sealed at the seams. The entire encased storage facility is buried two feet below the surface. There is one foot of bridging and one foot of topsoil separating the encased facility from the surface. Constructed within the facility is a leachate collection system designed to remove free liquids from the stored PCBs waste and a leachate detection system designed to indicate the presence of any leachate that might migrate through the encasing liners.

Since October 1982 the State has continuously monitored and inspected the facility on a monthly basis in accordance with EPA permit conditions and approved sampling methodologies. Monitoring activities are the responsibility of the Solid and Hazardous Waste Management Branch, Environmental Health Section, Division of Health Services, North Carolina Department of Human Resources. The fact that no free liquids have ever been discovered in the leachate detection system indicates that there has been no migration of free liquids through the liners which completely encase the contaminated waste material. All free liquids which have been removed from the leachate collection system have resulted from accumulated rainfall in the facility prior to completion of the landfill cap. After completion of the cap, the facility was completely encased by artificial and compacted clay liners which prevent water infiltration. The free liquids removed from the leachate collection system are treated in the on-site treatment works which passes the effluent through a sand filter and an activated carbon filter. The effluent is then discharged into an on-site surface impoundment lined with compacted clay.

After on-site treatment, no detectable levels of PCBs have ever been measured in the free liquids in the surface impoundment.

In addition to monthly monitoring of the leachate systems, samples of ground water, surface water and surface water sediments have been analyzed every six months. The sampling points designated by the EPA include Richneck Creek which is the boundary between plaintiffs' land and the county owned buffer zone. Analyses conducted on all samplings taken from the leachate systems, ground water, surface water and surface water sediments from October 1982 to the present reveal no harmful or dangerous releases of PCBs contaminants from the disposal facility. Further, no ground water, surface water or surface water sediments draining into Richneck Creek from the landfill site or the buffer zone have been contaminated by any detectable levels of PCBs. The site is periodically inspected and maintained to insure security and to prevent outside hazardous conditions from developing. A six-foot chain link fence topped with barbed wire surrounds the entire facility to prevent unauthorized persons and animals from entering the site.

In addition to the above-described findings of fact the trial court also found that prior to acquisition of the land in Warren County, local citizens and government officials voiced severe opposition to the disposal of PCBs contaminated soil in their county. During the hearings held prior to land purchase, State officials received notice that the proposed location would have a chilling effect on county land values especially with respect to property in close proximity to the site itself. Further, the trial court found that plaintiffs introduced evidence establishing that the value of their land has been substantially diminished as a result of the PCBs disposal facility owned and operated by the State.

Based on these findings of fact the trial court made the following conclusions of law:

The State's conduct in maintaining and operating the PCBs disposal facility is not unreasonable and constitutes a proper exercise of the police authority of the State to promote the health, safety and welfare of the people of North Carolina.

So long as the physical integrity of the PCBs disposal facility remains intact, there is no realistic likelihood of environmental

contamination to any adjoining land or any land in the vicinity of the facility. The evidence conclusively establishes that there have been no harmful or dangerous releases of PCBs buried in the disposal facility. Richneck Creek and its tributaries have not been contaminated by any detectable, harmful or dangerous levels of PCBs. There has been no actual physical invasion of plaintiffs' land by the PCBs stored in the disposal facility.

Notwithstanding the foregoing conclusions of law, the trial court concluded that plaintiffs have demonstrated "an actual interference with or disturbance of their property rights resulting in injuries which are not merely consequential or incidental in nature." The State's location and operation of the disposal facility has resulted in a "substantial non-trespassory invasion of plaintiffs' interest in the private use and enjoyment of their property in that it has resulted in a material diminution in value of plaintiffs' lands." The interference with plaintiffs' rights to use and enjoy their property caused by the State's operation of this facility requires that the public bear the cost of the diminution in value to that property.

The operation of the PCBs disposal facility constitutes a public nuisance permanent in nature resulting in a diminution in value of plaintiffs' lands and plaintiffs are entitled to just compensation. The date of taking is 5 October 1982 when the State began operation of the facility. All six parcels should be treated as one tract for the purpose of assessing damages. The plaintiffs shall not be required to obtain a survey of their property.

From judgment decreeing that the disposal facility constitutes a public nuisance permanent in nature and a taking of plaintiffs' property for the purpose of an easement accommodating the continued operation of the disposal facility and ordering that plaintiffs are entitled to just compensation for the material diminution in market value of their property, defendant appeals.

*Banzet, Banzet & Thompson by Lewis A. Thompson, III and Bobby W. Rogers for plaintiff-appellees.*

*Attorney General Thornburg by Assistant Attorney General Roy A. Giles, Jr. for the State.*

EAGLES, Judge.

I

[1]   The State first assigns error to the trial court's conclusion of law that the State's operation of the PCBs disposal facility "constitutes a public nuisance permanent in nature that has resulted in a diminution in value of plaintiffs' lands for which plaintiffs are entitled to just compensation."

On appeal, the conclusions of law drawn by the trial judge are fully reviewable and may be reversed if erroneous. *Hofler v. Hill and Hofler v. Hill*, 311 N.C. 325, 317 S.E. 2d 670 (1984); *Humphries v. City of Jacksonville*, 300 N.C. 186, 265 S.E. 2d 189 (1980). A conclusion of law must be based upon the facts found by the trial judge. *Montgomery v. Montgomery*, 32 N.C. App. 154, 231 S.E. 2d 26 (1977).

"A public nuisance exists wherever acts or conditions are subversive of public order, decency, or morals, or constitute an obstruction of public rights. Such nuisances always arise out of unlawful acts." *State v. Everhardt*, 203 N.C. 610, 617, 166 S.E. 738, 741-42 (1932). A public nuisance affects the local community generally and its maintenance constitutes an offense against the State. *Id.*

> To constitute a public nuisance, the condition of things must be such as injuriously affects the community at large, and not merely one or even a very few individuals . . . . Whatever tends to endanger life, or generate disease, and affect the health of the community; whatever shocks the public morals and sense of decency; whatever shocks the religious feelings of the community, or tends to its discomfort — is generally, at common law, a public nuisance, and a crime.

203 N.C. at 618, 166 S.E. at 742.

There are no findings of fact here that support a conclusion of law that the State's operation of the PCBs disposal facility constitutes a public nuisance permanent in nature. Indeed, there is no evidence upon which findings could have been made. This is not an action to abate a public nuisance. *See generally* 9 Strongs, N.C. Index 3d, *Nuisance* Section 10 (1977). Plaintiffs' cause of action is for inverse condemnation.

Plaintiffs argue that the type of nuisance to which they have been subjected is more properly classified as a private nuisance *per accidens* and the trial court's conclusion of a public nuisance rather than private nuisance is not prejudicial error. Plaintiffs rely on 5 Am. Jur. 2d, *Appeal and Error* Section 785 (1962): "The decision of the trial court should be affirmed if it is correct, although the lower court relied upon a wrong ground or gave a wrong reason, or the judgment or order complained of contains inaccurate or erroneous declarations of law. The judgment or order need not be sustained for the same reason or for all the reasons relied upon by the trial court."

The trial court's judgment here cannot be sustained on the basis of private nuisance *per accidens.* An intentional private nuisance *per accidens* is one which constitutes a nuisance by reason of its location or the manner in which it is constructed, maintained or operated. *Watts v. Manufacturing Company,* 256 N.C. 611, 124 S.E. 2d 809 (1962); *Morgan v. Oil Co.,* 238 N.C. 185, 77 S.E. 2d 682 (1953). "It is the *unreasonable* operation and maintenance that produces the nuisance." 256 N.C. at 617, 124 S.E. 2d at 813 (emphasis in original). In addition, for liability to exist, there must be a "*substantial* non-trespassory invasion of another's interest in the private use and enjoyment of property." *Id.* (emphasis in original). Therefore, in order to make out a *prima facie* case plaintiff must show (1) that defendant's maintenance and operation of the enterprise is *unreasonable* and (2) that because of the unreasonable conduct there has been *substantial* injury and loss of value to plaintiff's property. *Id.* at 618, 124 S.E. 2d at 814. The essential inquiry in any nuisance action is whether the defendant's conduct is unreasonable. *Pendergrast v. Aiken,* 293 N.C. 201, 236 S.E. 2d 787 (1977).

There is no finding or conclusion of law that the State's conduct in maintaining and operating the PCBs disposal facility was unreasonable. On the contrary, the trial court concluded that the State's conduct "in maintaining and operating the PCBs disposal facility upon the lands in question is not unreasonable and constitutes a proper exercise of the police authority of the State to promote the health, safety and welfare of the people of North Carolina." We have reviewed this conclusion of law in light of the evidence presented and the trial court's findings of fact and have

determined that it is supported by both the evidence and the findings of fact.

There is no evidence to support plaintiffs' recovery on the basis of nuisance, public or private. The trial court's conclusion of law number six, that the State's operation of the PCBs disposal facility constitutes a public nuisance is unsupported by its findings of fact, is in direct conflict with its conclusions of law, is erroneous and must be set aside.

## II

[2]  The State assigns error to the trial court's conclusion of law that there has been a "taking" of plaintiffs' lands, or an interest therein, for which plaintiffs are entitled to recover just compensation.

The trial court concluded that "plaintiffs have shown an actual interference with or disturbance of their property rights resulting in injuries which are not merely consequential or incidental in nature," and that the State's location and operation of the disposal facility have "resulted in a substantial non-trespassory invasion of plaintiffs' interest in the private use and enjoyment of their property in that it has resulted in a material diminution in value of plaintiffs' lands." Based on its findings and conclusions, the trial court ordered and decreed that:

> The interest taken in plaintiffs' land is an easement for the accommodation of the continued operation of the PCBs disposal facility on the site in question. This interest is maximally defined as the right of the State to continue to operate the PCBs disposal facility so long as the physical integrity of the facility remains intact, and it is operated in such a manner as to prevent any physical invasion of plaintiffs' lands by the PCBs stored therein.

This portion of defendant's appeal addresses the validity of plaintiffs' claim for inverse condemnation. In essence, plaintiffs contend that the State's placement of the PCBs disposal facility in close proximity to plaintiffs' land constitutes a governmental taking for which they are entitled to just compensation under the Fourteenth Amendment to the United States Constitution and under Article 1, Section 19 of the Constitution of North Carolina.

The State, on the other hand, contends that there has been no governmental taking of any kind. We believe that resolution of this issue depends upon our interpretation of *Long v. City of Charlotte*, 306 N.C. 187, 293 S.E. 2d 101 (1982).

In *Long* the Supreme Court held that for a "taking" to occur "there need only be a substantial interference with elemental rights growing out of the ownership of the property." *Id.* at 199, 293 S.E. 2d at 109; *see Stillings v. Winston-Salem*, 311 N.C. 689, 692, 319 S.E. 2d 233, 235 (1984). Actual occupation of the land, dispossession of the landowner or even a physical touching of the land is not necessary under the modern construction of the "taking" requirement. 306 N.C. at 198-99, 293 S.E. 2d at 109. Examples of "takings" cited by the court include odors from a nearby trash dump, *Hines v. City of Rocky Mount*, 162 N.C. 409, 78 S.E. 510 (1913); odors from an adjacent sewage disposal plant, *Gray v. City of High Point*, 203 N.C. 756, 166 S.E. 911 (1932); and odors, smoke, ashes, rats, mosquitoes and other insects from a sewage disposal plant, *Ivester v. City of Winston-Salem*, 215 N.C. 1, 1 S.E. 2d 88 (1939). As explained by the Court "[t]hough no physical touching was present in those cases, the wafted smoke, odors, dust, or ashes over the plaintiff's land warranted compensation for a 'taking.'" 306 N.C. at 199, 293 S.E. 2d at 109.

"In order to recover for inverse condemnation, a plaintiff must show an actual interference with or disturbance of property rights resulting in injuries which are not merely consequential or incidental." *Id.* The Court in *Long* added that a "taking" has been defined as "entering upon private property for more than a momentary period, and under warrant or color of legal authority, devoting it to a public use, or otherwise informally appropriating or injuriously affecting it in such a way as substantially to oust the owner and deprive him of all beneficial enjoyment thereof." *Id.* (quoting *Penn v. Coastal Corp.*, 231 N.C. 481, 57 S.E. 2d 817 (1950)).

*Long* involved landowners alleging damage caused by low flying aircraft in taking off from and landing in the city owned and operated airport. As the Court pointed out, flights at altitudes that would in no way damage or interfere with the use and enjoyment of land have been held not to constitute a taking or damaging of the property: "[I]t has been recognized that there must be a

substantial interference with the use and enjoyment of the land, not merely incidental damage, before a taking results." *Id.* at 200, 293 S.E. 2d at 110. "A compensable taking of a flight or avigation easement does not occur until overflights constitute a *material* interference with the use and enjoyment of property, such that there is substantial diminution in fair market value." *Id.* (quoting *Cochran v. City of Charlotte*, 53 N.C. App. 390, 397, 281 S.E. 2d 179, 186 (1981) (emphasis original), *cert. denied*, 304 N.C. 725, 288 S.E. 2d 380 (1982) ).

Not every act or happening injurious to a landowner, his property or his use of his property is compensable. 306 N.C. at 199, 293 S.E. 2d at 109. The public importance and social utility of activity must be balanced against the inconvenience, annoyance and aggravation to those in its vicinity. *Id.* at 200, 293 S.E. 2d at 110. "This balancing of interests necessarily and properly places a heavy burden on the landowner." *Id.* The balancing of interests is established by "the requirement that in order to recover for the interference with one's property, the owner must establish not merely an occasional trespass or nuisance, but an interference substantial enough to reduce the market value of his property." *Id.* With regard to the issue of compensability (entitlement to recover), "the fair and logical rule is that a landowner is entitled to compensation if the interference caused by the flights is sufficiently direct, sufficiently peculiar and of sufficient magnitude to support a conclusion that a taking has occurred." *Id.* at 201, 293 S.E. 2d at 110. The test is whether the value of plaintiff's property has been substantially impaired by a "taking." *Id.* Property means not only the thing possessed but also "the right of the owner to the land; the right to possess, use, enjoy and dispose of it, and the corresponding right to exclude others from its use." *Id.* (quoting *Hildebrand v. Telegraph Co.*, 219 N.C. 402, 408, 14 S.E. 2d 252, 256 (1941) ). "Thus, where a person's right to possess, use, enjoy or dispose of his land is substantially impaired, his property has been taken, and he is entitled to recover to the extent of the diminution in his property's value." *Id.* at 201, 293 S.E. 2d at 110-11. The measure of damages is the difference in the fair market value of the property immediately before and immediately after the taking. *Id.* at 201, 293 S.E. 2d at 111.

*Long* requires "an actual interference with or disturbance of property rights resulting in injuries which are not merely conse-

quential or incidental." *Id.* at 199, 293 S.E. 2d at 109. While the term "actual interference" does not require actual physical invasion, actual dispossession or even a physical touching, the term does require that plaintiffs show interference with the use and enjoyment of their property substantial enough to reduce market value. Here the trial court concluded that the plaintiffs had shown actual interference with the private use and enjoyment of their property by showing that the State's location of the landfill "resulted in a material diminution in value of plaintiffs' lands." In essence, the trial court concluded that there was a "taking" because the market value of plaintiffs' lands had been diminished. However, we believe that the trial court skipped an important step and its conclusion is based on a misapprehension of the law.

A reduction in market value, standing alone, does not constitute an "actual interference with or disturbance of" plaintiffs' use and enjoyment of their property. *Long* requires an actual interference (the cause) substantial enough to reduce the market value of plaintiffs' property (the effect). Plaintiffs here have proved the effect—a material diminution in value—but not the cause. They have not demonstrated any actual interference with the use and enjoyment of their property caused by the State's operation of the PCBs disposal facility. Plaintiffs' complain about placement and assert that their damages stem from location of the PCB landfill. However, placement or location is not enough; if it were, then the plaintiffs in *Long* could have demonstrated a right to recover for inverse condemnation without ever having to show that aircraft overflights actually interfered with their use and enjoyment of their property, so long as they could prove reduced market value due solely to the location of and their proximity to the city owned and operated airport. Reading *Long* as a whole, we believe it requires that plaintiffs show more than a diminution in market value. Plaintiffs must show that the location and the operation of the PCBs disposal facility combined to constitute an "actual interference" with the use and enjoyment of their property.

The trial court concluded that the State's conduct in maintaining and operating the disposal facility upon the lands in question is not unreasonable and constitutes a proper exercise of the police authority of the State and that so long as the physical integrity of the State-owned facility remains intact, there is no

realistic likelihood of environmental contamination to any lands either adjoining or in the vicinity of the facility as a result of the PCBs stored in the facility. Additionally, the trial court concluded that the evidence conclusively establishes that there have been no harmful or dangerous releases of PCBs buried in the disposal facility. No ground water, surface water or surface water sediments draining or being discharged into Richneck Creek or its tributaries from the PCBs disposal site, or the county-owned buffer zone which completely surrounds the disposal site, have been contaminated by any detectable or harmful or dangerous levels of PCBs buried in the site. There has been no actual physical invasion of plaintiffs' lands by the PCBs stored in the facility. These conclusions of law are supported by the trial court's findings of fact and the evidence in the record; as a result, they are conclusive and binding on appeal. Plaintiffs have failed to show any actual interference with the use and enjoyment of their property caused by the State's operation of the PCBs disposal facility which is "sufficiently direct, sufficiently peculiar and of sufficient magnitude to support a conclusion that a taking has occurred." 306 N.C. at 201, 293 S.E. 2d at 110.

## CONCLUSION

Plaintiffs are not entitled to recover on the ground of nuisance, public or private, and the trial court's conclusions that the State's operation of the PCBs disposal facility constitutes a public nuisance is erroneous and must be set aside. Further, plaintiffs have failed to demonstrate that they are entitled to recover based upon inverse condemnation. The trial court's conclusions that plaintiffs "have shown an actual interference with or disturbance of their property rights resulting in injuries which are not merely consequential or incidental in nature" and that "the State's location and operation of the PCBs disposal facility on the site in question have resulted in a substantial non-trespassory invasion of plaintiffs' interest in the private use and enjoyment of their property in that it has resulted in a material diminution in value of plaintiffs' lands" are not supported by the findings of fact or the evidence of record. Having resolved the first two issues in favor of the State, it is unnecessary to address the State's remaining arguments and assignments of error. The judgment of the trial court is

Reversed.

Judges WELLS and GREENE concur.