No. 94,602

LOYD SMITH, *et al.*, INDIVIDUALLY AND AS REPRESENTATIVES OF THOSE PERSONS SIMILARLY SITUATED, *Appellees/Cross-appellants*, v. KANSAS GAS SERVICE COMPANY; ONEOK, INC.; MID CONTINENT MARKET CENTER, INC.; ONEOK GAS STORAGE, LLC; ONEOK GAS STORAGE HOLDINGS, INC.; ONEOK GAS TRANSPORTATION, LLC, *Appellants/Cross-appellees*, and WESTERN RESOURCES, INC., *Appellee/Cross-appellant*.

(169 P.3d 1052)

Opinion filed October 26, 2007.

*James T. Ferrini*, of Clausen Miller P.C., of Chicago, Illinois, argued the cause, and *Barbara I. Michaelides*, of the same firm, and *Charles D. Lee*, of Martindell, Swearer & Shaffer, LLP, of Hutchinson, were with him on the briefs for appellants/cross-appellees ONEOK, Inc. and Mid Continent Market Center, Inc.

*James P. Frickleton*, of Bartimus, Frickleton, Robertson & Gorny, P.C., of Leawood, argued the cause, and *John F. Edgar* and *John M. Edgar*, of The Edgar

Law Firm LLC, of Kansas City, Missouri, *Lee Thompson*, of Thompson Law Firm, LLC, of Wichita, and *Rex A. Sharp*, of Gunderson, Sharp & Walke, L.L.P., of Prairie Village, were with him on the brief for appellees/cross-appellants.

*Daniel D. Crabtree, John C. Nettels, Jr.*, and *Angela G. Heppner*, of Stinson Morrison Hecker LLP, of Overland Park, were on the brief for appellee/cross-appellant Westar Energy, Inc. (formerly known as Western Resources, Inc.).

The opinion of the court was delivered by

JOHNSON, J.: ONEOK, Inc. (ONEOK) and Mid Continent Market Center, Inc. (MCMC) appeal the judgment in favor of the plaintiffs in a class action lawsuit filed by Reno County real property owners who claimed to have suffered diminished property values as a result of the escape of natural gas from the Yaggy Field gas storage facility. Finding the district court erred in denying defendants' motion for judgment as a matter of law, we reverse.

In *Hayes Sight & Sound, Inc. v. ONEOK, Inc.*, 281 Kan. 1287, 136 P.3d 428 (2006), we reviewed in some detail the events surrounding the January 2001 natural gas incident in Hutchinson, Kansas. For purposes of this appeal, we will provide a brief overview of those events.

### The Incident

On January 17, 2001, an explosion occurred in a downtown Hutchinson business, and firemen determined that the ensuing fire appeared to be fueled by natural gas. Geysers of gas and brine appeared at various locations in the city. The next day a mobile home exploded in the Big Chief Mobile Home Park, killing two people. A number of residences and businesses were evacuated.

Consultants converged on the city and eventually the source of the problem was traced to a leak in the casing of a well which was part of the Yaggy underground natural gas storage facility located northwest of Hutchinson. Approximately 143 million cubic feet of gas escaped from the storage facility. Experts opined that the escaped gas migrated underground through a porous geologic formation and rose to the surface in Hutchinson through abandoned brine wells which were not properly plugged.

*Ownership and Control of Yaggy Facility*

At the time of the incident, MCMC, a subsidiary of ONEOK, operated the Yaggy facility; Kansas Gas Service Company was an incorporated division of ONEOK. Western Resources, Inc. (now Westar) had owned or controlled the facility prior to 1997.

*Remedial Action*

After the source of the problem was identified, 58 deep drilled vent wells were placed in various locations in the area for the purpose of allowing the gas to escape into the atmosphere. Approximately 15 of those wells actually emitted gas; the remaining wells were dry holes.

*Lawsuits*

Many of the property and business owners who suffered damages from the incident individually settled or litigated their respective claims. See, *e.g.*, *Hayes Sight & Sound, Inc.*, 281 Kan. 1287. This lawsuit was filed as a class action against the owners/operators of the Yaggy storage facility. The district court certified the class involved in this appeal, defined as follows: " 'All owners of real property in Reno County, Kansas, who have suffered, or will suffer diminished property values as a result of release and/or threatened release of natural gas from the Yaggy facility.' "

A class of Hutchinson business owners claiming business interruption damages was included in the initial petition, and the two class actions were tried together. However, after the initial petition, the court treated the two class actions as separate cases, and the business owners class has a separate appeal pending before this court. See *Gilley v. Kansas Gas Service Co.*, 285 Kan. 24, 169 P.3d 1064 (2007). This opinion deals exclusively with the real property owners' class action.

In its third amended petition, the real property class alleged negligence, strict liability, res ipsa loquitur, nuisance, and trespass as a result of the Yaggy natural gas escape. Claiming the class members had lost the quiet enjoyment of their property and suffered economic harm and damage with respect to property values, the

petition sought compensatory damages, injunctive relief, and punitive damages.

All of the defendants, ONEOK, MCMC, and Western Resources, filed a joint motion for summary judgment, arguing that plaintiffs could not: (1) establish an actual entry onto their properties for the trespass claim; (2) establish that they suffered some type of injury for the negligence, res ipsa loquitur, and strict liability claims; (3) establish a substantial and unreasonable interference with the use of their properties for the nuisance claim; and, therefore, (4) plaintiffs could not recover diminution of value of land due to marketplace stigma without physical injury or intrusion upon the properties at issue. The district court denied the motion, opining that genuine issues of material fact existed, such as whether there was a physical intrusion of gas upon or under the plaintiffs' properties.

Subsequently, the plaintiff class dismissed its trespass claim, and the court opined that strict liability was inapplicable. Ultimately, the action proceeded to trial on the theories of negligence and nuisance with the plaintiff class seeking actual damages of $81,810,000, plus punitive damages and attorney fees.

At the trial, the named representatives of the class did not testify. However, other Reno County residential real property owners testified. Some related their personal experience in trying to sell their homes after the incident. Others described their reactions to having a vent well drilled on their property. At the defendants' request and over the plaintiffs' objection, the district court instructed the jury that the property owners' testimony would be about their own personal experience with their own property and was not to be considered "as either common or typical of Reno County residential landowners."

At the core of the plaintiffs' case was the testimony of their expert, Dr. Robert Simons, who was retained to perform a mass appraisal on the Reno County real property affected by the gas escape to determine class-wide damages. At trial, Dr. Simons limited his opinion to those land tracts situated within ¼ mile of a deep drilled vent well (DDV). That area encompassed approximately 5,000 property owners.

Dr. Simons performed calculations on three bases: a housing trends study, a contingent evaluation survey, and a hedonic regression analysis. He then averaged the result of the three bases to obtain his ultimate damage determination.

The housing trends study compared the post-incident property values in Reno County with those of surrounding counties. Dr. Simons based the contingent evaluation survey upon responses to hypothetical questions posed in a poll of area residents. A hedonic regression analysis identifies the components affecting the value of a residence, such as the age and size of the building and the property's proximity to schools and parks, and then assigns a value to each component. Here, Dr. Simons opined that the component of a residence's proximity to a DDV effected a 5% loss in value for those residences within ¼ mile.

At the close of the plaintiffs' case, ONEOK and MCMC moved for judgment as a matter of law, arguing, *inter alia*, that the plaintiffs' claim of diminished value was unsupported by evidence of class-wide physical injury and that plaintiffs had failed to establish the required elements of the negligence and nuisance claims. The district court summarily denied the motion.

After a 16-day trial, the jury was instructed to determine whether any defendant was at fault by way of negligence or nuisance, to assign a percentage of fault to each defendant, to determine the total damages sustained by the plaintiff class, and to determine whether any defendant acted in a willful or wanton manner. The jury awarded 5 million dollars in damages, assigning 80% of the fault to ONEOK, 20% to MCMC, and 0% to Western Resources. The jury found that none of the defendants acted in a willful or wanton manner, precluding punitive damages. After adding attorney fees, the district court entered judgment against ONEOK for $6,154,797.42 and against MCMC for $1,538,699.36.

ONEOK and MCMC timely appealed the verdict, including the denial of their summary judgment and judgment as a matter of law motions. The real property class cross-appealed, complaining of the amount of the verdict. Western Resources also filed a prophylactic cross-appeal in the event judgment in its favor was disturbed on appeal. The case was transferred to this court on the parties' mo-

tions pursuant to K.S.A. 20-3017. This court granted a joint motion to dismiss Western Resources' cross-appeal as moot, given that none of the parties sought to disturb its favorable judgment.

## APPEAL ISSUES

The statement of issues in appellants' brief confines this appeal to a consideration of the district court's denial of their motion for summary judgment and their motions for judgment as a matter of law. The brief declares that "[a] new trial is neither warranted nor sought by the defendants," and, at oral argument, defense counsel confirmed that defendants do not challenge the district court's class certification. Obviously, defendants seek an outright reversal of the judgment against them, but do not want to disturb the jury's award in the event that reversal is not granted. Appellants identify the specific questions presented as being:

"[W]ill Kansas compensate real property owners for stigma/fear in the mind of the buying public, where that fear is unfounded because the property is not contaminated and its use has not been restricted;

"[D]id plaintiffs suffer the permanent loss claimed, where the alleged causes are not permanent, but are abatable;

"[C]an plaintiffs recover damages where the plaintiffs, who are class representatives, did not testify at trial and those witnesses who did testify offered anecdotal evidence and did not establish standing;

"[D]id plaintiffs fail to prove the amount of damages where plaintiffs' damage witness calculated damages as an aggregate, using methodologies which have been judicially determined to 'obscure conceptual and practical obstacles almost certain to negate . . . an across the board formula?' "

The appellee plaintiff class disagrees with appellants' statement of the issues, contending that the manner in which appellants present their arguments establishes that the sole issue is whether the evidence presented at trial is sufficient to make a cognizable claim for damages under Kansas law. In a cross-appeal, the plaintiff class contend that the trial court erred in giving limiting instructions to the jury which effectively negated the testimony of class members at trial and that the prejudicial effect of the limiting instructions rendered the damage award inadequate.

## STANDARD OF REVIEW

Citing to *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 126, 815 P.2d 72 (1991), ONEOK and MCMC ask for a de novo review of the summary judgment denial. However, *Brown* refers to the oft-stated summary judgment standard:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citation omitted.]' *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999])." *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

On the other hand, when the parties have no factual dispute, a de novo appellate review is appropriate. *Roy v. Young*, 278 Kan. 244, 247, 93 P.3d 712 (2004).

In the present case, the district court found that there were genuine issues of material fact at the time the summary judgment motion was heard. ONEOK and MCMC do not address why they believe the district court erred in that finding, especially given that the trespass claim was still in play.

The property owners class also reminds us that summary judgments are to be granted with caution in negligence actions. See *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409 (1998).

" 'In a negligence action, summary judgment is proper if the only questions presented are questions of law. To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact.' " *Schmidt v. HTG, Inc.*, 265 Kan. 372, 396-97, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998) (quoting *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 [1992]).

See *South v. McCarter*, 280 Kan. 85, 94, 119 P.3d 1 (2005).

ONEOK and MCMC also argue that the denial of the motions for judgment as a matter of law are reviewed de novo, citing to *Fisher v. Sears, Roebuck & Co.*, 207 Kan. 493, 494-95, 485 P.2d 1309 (1971). A directed verdict is now referred to as a judgment as a matter of law. K.S.A. 60-250. Our standard of review on a motion for judgment as a matter of law is the same as previously employed for a directed verdict. *Stover v. Superior Industries Int'l, Inc.*, 29 Kan. App. 2d 235, 237, 29 P.3d 967, *rev. denied* 270 Kan. 903 (2000).

" 'When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict.' *Calver v. Hinson*, 267 Kan. 369, Syl. ¶ 1, 982 P.2d 970 (1999)." *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 202, 4 P.3d 1149 (2000).

In other words, a motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party. *Cf. Brown v. United Methodist Homes for the Aged*, 249 Kan. at 126.

## PHYSICAL INJURY/INTERFERENCE WITH USE

Initially, defendants argue that the plaintiff class failed to prove that the real property in the class suffered physical injury from the escaped gas, or that, class-wide, the real property owners suffered an interference with the use and enjoyment of their property because of the gas contamination. Resolving all facts and inferences which may reasonably be drawn from the evidence in favor of the plaintiff class, we agree with the defendants' assertion.

The plaintiff class does not directly address the question, but it intimates that there was a physical injury to the property, as evidenced by the testimony of its expert geologist. That witness opined that, with a high degree of probability, the natural gas from the Yaggy facility permeated under each of the properties located within ¼ mile of a DDV well and that some pockets of gas must

remain in the area. However, the plaintiff class dropped its trespass claim, and the issue is not whether natural gas, at some point, passed under the class members' properties, but rather whether the escaping gas caused any injury to the properties.

The plaintiff class offered the testimony of selected Hutchinson area real property owners who related their respective personal experiences following the initial gas explosion. None of those witnesses established physical injury to their property or an interference with the use and enjoyment of their property.

Wendell Friesen owned a house within the Hutchinson city limits which he put on the market in the latter part of 2001. The Reno County Appraiser had valued the property at $134,100 in 2000 and at $125,570 in 2001. Originally, Friesen tried to sell the home on his own, listing it at $129,000. Subsequently, a realtor sold the property for $116,000 some time before December 2001, but after the terrorist attack of September 11. The house was on the market for a total of 8 to 10 weeks. Friesen did not say that his property had been physically affected by the gas incident or that his personal use and occupancy had been affected. Rather, his complaint was that he was disappointed in the ultimate sale price.

Ken Gamber and Pauline Berend testified about their respective residences, both situated on farms outside of the Hutchinson city limits. Both property owners had entered into an agreement with the gas company to permit a DDV well to be placed on their property. Both described being nervous about having the vent wells on their property. However, neither witness described any physical damage, other than that occasioned by the drilling and operation of the vent wells to which they had consented and for which the driller had agreed to pay damages. Berend testified that her use of the property was restricted in that she was afraid to use an outside charcoal grill, albeit that fear emanated from her observation of the discharge from the vent well, to which she had consented. Gamber acknowledged that the Reno County appraisal of his property had increased every year since the gas incident; Berend did not know whether the appraised value of her property was higher than before. Both properties were susceptible to frequent flooding from a nearby creek.

Jeff Sandberg owned a modular home across the street from the Big Chief Mobile Home Park, where the fatal explosion of January 18, 2001, occurred. He also ran an asphalt business from that location. Sandberg described his forced evacuation and loss of use of the property in the months following the explosion, as well as some work that was performed on a brine well situated on his property. However, Sandberg acknowledged that he had been fairly compensated for his business interruption, motel expenses, and other financial losses. His major complaint was that he was unable to sell his property after the gas incident. He initially listed the property for sale at $83,000 and subsequently lowered his asking price to $79,000, before taking the property off of the market in 2002. Sandberg testified that he was unaware that the Reno County appraisal for his property in 2001 was $59,700. When Sandberg was asked whether he had listed his property for sale on two occasions before the explosion, he responded, "I may have, I don't know for sure. I can't recall it if I did."

James Updegrove owned property about 3 blocks from the Big Chief Mobile Home Park which contained a 100+-year-old, 2-story brick firehouse that had been converted into a residence. While Updegrove testified about cracks in the structure's walls, foundation, and floors, he acknowledged that the structure was cracked before the explosion and that he could not say there were any more cracks after the explosion than before. Other than the period of forced evacuation, Updegrove did not testify about any interference with his use and enjoyment of the property. He mentioned that he tried to list the property for sale after the explosion, but the realtor would not take the listing. Updegrove conceded that his property would only appeal to a "unique audience" of buyers and that he had no personal knowledge of whether the value of his property had been affected in any way by the Hutchinson gas incident.

Tammy Pohl testified about losing a home to foreclosure after the gas incident. She acknowledged that her experience was not common with anyone else in Reno County. She and her husband had built the home and subsequently refinanced the property and used part of the proceeds in their lawn service business. Appar-

ently, about the time of refinancing, the property was privately appraised at $84,000. Later, the Pohls purchased another home for $120,000, intending to sell the self-built residence. They received an offer of $51,000, but did not accept it, even though Pohl was aware that the Reno County appraisal for the year 2000 was $52,400. Upon advice of counsel, the Pohls discontinued making payments on the refinancing note and foreclosure followed. The Pohls were not living in the self-built residence at the time of the explosion, and the property did not sustain any physical damage.

In short, the anecdotal witnesses did not establish either physical injury or interference. Likewise, the plaintiffs' damage expert, Dr. Simons, did not base his estimate of the class-wide loss in market value on any physical injury to the real property or any interference with the use and enjoyment of the property. To the contrary, his opinion was based upon a perceived stigma or fear among the buying public, regardless of whether such fear had a basis in fact or science. Thus, when the district court heard defendants' motion for judgment as a matter of law, it had no evidence before it that the class had suffered physical injury to the real property or that the gas escape had interfered with the class members' use and enjoyment of their property.

## STIGMA OR MARKET FEAR DAMAGES

Accordingly, we perceive that the core and dispositive question for our determination is whether a property owner can collect damages under either a negligence or nuisance theory for a diminution in the property's market value caused by the stigma or market fear resulting from an accidental contamination where the property owner has not proved either a physical injury to the property or an interference with the owner's use and enjoyment of the property. In Kansas, the answer to that question is "no."

### Recognition of Stigma Damages in Kansas

The plaintiff class asserts that Kansas has specifically recognized stigma damages, pointing to prior Kansas cases in which our courts have found that damage awards can include the diminution of the market value of a plaintiff's real property resulting from a market

fear or stigma. A review of those cases reveals the distinguishing factor that they involved properties which had sustained physical injury as a direct result of the respective defendant's action or inaction.

In *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 3, 815 P.2d 528 (1991), this court reviewed the judgment of damages awarded to landowners in an easement condemnation proceeding, where the principal question raised by the utility company dealt with the admissibility of nonexpert testimony "regarding fear in the marketplace of high voltage electrical transmission lines and its effect on property valuation." The *Ryan* court reviewed the Court of Appeals decision in *Willsey v. Kansas City Power & Light Co.*, 6 Kan. App. 2d 599, 631 P.2d 268, *rev. denied* 230 Kan. 819 (1981), and opined that the effect of *Willsey* had been to adopt the "minority rule," with which the Supreme Court agreed. 249 Kan. at 7. Accordingly, *Ryan* held:

> "In a condemnation proceeding to acquire an easement for installation of a high voltage electrical line, testimony regarding fear in the marketplace is admissible with respect to the value of the property taken by condemnation without proof of reasonableness of the fear since fear of a high voltage line is reasonable." 249 Kan. 1, Syl. ¶ 1.

In both *Ryan* and *Willsey*, the plaintiffs owned the land upon which the defendants were going to construct and maintain high-power electrical transmission lines. There was no question that the land would be damaged to some extent during construction and that the electric lines would interfere with the landowners' use and enjoyment of their respective property. The only question was whether the jury could consider the general public's fear of high-voltage power lines as a factor in assessing the landowners' total damages.

In *Horsch v. Terminix Int'l Co.*, 19 Kan. App. 2d 134, 865 P.2d 1044 (1993), *rev. denied* 254 Kan. 1007 (1994), the plaintiffs had purchased a house relying in part upon a termite inspection report indicating that the house had no evidence of termite damage. Subsequently, the Horsches discovered termite damage requiring repairs costing $5,045. In their negligence action against the termite inspection company, the plaintiffs sought damages for the cost of

repairs and claimed additional damages for the diminution in the market value of their house resulting from marketplace stigma or fear. Terminix argued that plaintiffs had suffered only temporary damages, making the cost of repairs the sole remedy. Plaintiffs' expert opined the house had suffered a permanent reduction in value due to the stigma of termite damage. Ultimately, the *Horsch* court held:

"Under the facts of this case, where a buyer purchased a house in reliance on a termite company's report that incorrectly stated the house had no prior termite damage, the company may be liable both for the cost of repair of the damage and any reduction in market value of the house caused by marketplace fear of houses with prior termite damage." 19 Kan. App. 2d 134, Syl. ¶ 6.

These cases instruct us that a diminution in property value resulting from the general public's fear of high-power electrical lines or fear of termite damage can be a component in measuring the damages suffered by the owner of the property *directly* affected by the stigmatizing condition. Further, those cases stand for the proposition that the general public's fear of high-power electric lines and termites is a reasonable concern. However, those cases do not answer our question. As noted, the plaintiff class did not prove that the stigmatizing condition directly affected its real property or that the stigma was a reasonable fear.

The scenario before us would be more akin to an action by Ryan's neighbor against Kansas Power & Light Company, claiming that his or her adjacent land has suffered a diminished fair market value because of the stigma of having a high-power electric line on Ryan's property, or an action by Horsches' neighbor against Terminix, claiming a reduced property value due to the stigma of having a termite damaged house in close proximity. In other words, the plaintiff class would have us expand the holdings in *Ryan*, *Willsey*, and *Horsch* beyond their facts.

Likewise, even when acknowledging that stigma damages may be recoverable, our courts have cautioned that " '[r]emote, speculative and conjectural damages are not to be considered.' " *Ryan*, 249 Kan. at 6 (quoting *Willsey*, 6 Kan. App. 2d at 611); see also *Horsch*, 19 Kan. App. 2d at 140 ("Under Kansas law, recovery will not lie where the alleged damages are too conjectural or speculative

to form a basis for measurement."). Indeed, *Horsch* opined that "[t]here is no one set rule under Kansas law for recovery of damages for the loss of real property," but rather "[t]he measure of damages depends on the facts of the case." 19 Kan. App. 2d at 138.

### Causes of Action

In separate counts of the third amended petition, plaintiff class claimed a cause of action for both negligence and nuisance. The count alleging negligence recites that "[t]he plaintiffs have sustained damage including but not limited to: unreasonable interference with the use and enjoyment of their property and damage to their property values." The nuisance count alleges the same damages. Thus, the theory for both causes of actions appears to be identical, *i.e.*, the defendants were negligent in the maintenance and operation of the Yaggy storage facility; that particular negligence allowed natural gas to escape into the surrounding environment; and, as a result, the plaintiff class property owners suffered a decrease in the market value of their property.

As we have noted, this appeal deals only with damages; the defendants' culpability is not in issue. The claimed damage is the same for both causes of action, and the parties, at times, fail to distinguish between the nuisance and negligence claims, albeit plaintiffs' counsel insisted at oral argument that the case involves both a nuisance claim and a "general negligence" action. In *Culwell v. Abbott Construction Co.*, 211 Kan. 359, 364, 506 P.2d 1191 (1973), we discussed the relationship between nuisance and negligence:

"Nuisance is a field of tort liability rather than a type of tortious conduct. Nuisance has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion. Professor Prosser concludes that the attempt frequently made to distinguish between nuisance and negligence, for example, is based entirely upon a mistaken emphasis based upon what the defendant has done rather than the result which has followed, and forgets completely the well-established fact that negligence is merely one type of conduct which may give rise to a nuisance. (Prosser, Law of Torts, 4th Ed., § 87, p. 573.) In other words a nuisance may result from conduct which is intentional or negligent or conduct which falls within the principle of strict

liability without fault. The point is that nuisance is a result and negligence is a cause and they cannot be distinguished otherwise."

*Nuisance*

To the extent the defendants suggest that a nuisance action requires physical injury, that argument is misguided. Damages for a nuisance claim focus on the impact upon the landowner, rather than the land itself. Therefore, the question is whether the landowner must show an interference with the use and enjoyment of the property.

" 'A nuisance is an annoyance, and any use of property by one which gives offense to or endangers the life or health, violates the laws of decency, unreasonably pollutes the air with foul, noxious odors or smoke, or obstructs the reasonable and comfortable use and enjoyment of the property of another may be said to be a nuisance.

" 'A private nuisance is a tort related to an unlawful interference with a person's use or enjoyment of his land. The concept of a private nuisance does not exist apart from the interest of a landowner. [*Culwell*, 211 Kan. 359, Syl. ¶¶ 1, 2.]' " *Vickridge Homeowners Ass'n, Inc. v. Catholic Diocese of Wichita*, 212 Kan. 348, 354, 510 P.2d 1296 (1973).

The parties spend some time and energy arguing about the Ohio case of *Chance v. B.P. Chemicals, Inc.*, 77 Ohio St. 3d 17, 29, 670 N.E.2d 985 (1996). There, the Ohio Supreme Court found that when a plaintiff claims an indirect invasion of his or her property, some type of physical damage or interference with use must be shown, and, therefore, the trial court had not abused its discretion in prohibiting the plaintiffs from presenting evidence on speculative stigma damages. 77 Ohio St. 3d at 29. However, by the time of that ruling, nuisance and negligence had been removed from the case and the action was proceeding on a trespass theory. The result in this state on a trespass theory would likely be the same. See *Gross v. Capital Electric Line Builders, Inc.*, 253 Kan. 798, 801, 861 P.2d 1326 (1993) (plaintiff must prove substantial damages to the land to recover for intangible invasion). However, in this case, plaintiff class dropped its trespass claim before trial.

Subsequently, however, the *Chance* decision was further interpreted in *Ramirez v. Akzo Nobel Coatings, Inc.*, 153 Ohio App. 3d 115, 119, 791 N.E.2d 1031 (2003), to mean that pure environmen-

tal stigma, defined as when the value of real property decreases due solely to public perception or fear of contamination from a neighboring property, does not constitute a basis for compensable damages in Ohio. A plaintiff must show actual harm, even in a claim for private nuisance. On the other hand, upon showing sufficient interference to establish a nuisance, a plaintiff is entitled to the damages flowing from that nuisance.

It appears that the majority of other jurisdictions that have considered the issue hold that a nuisance claim requires a physical presence or an interference with the plaintiff's use and enjoyment of the real property which is separate and apart from the diminution of the property's market value. See *Adams v. Star Enterprise*, 51 F.3d 417, 422-23 (4th Cir. 1995) (applying Virginia law) (no recovery for a private nuisance which is not visible or otherwise capable of physical detection from plaintiff's property); *Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 369 (M.D.N.C. 1997) (need actual interference [cause] substantial enough to reduce market value [effect]); *Miller v. Jasinski*, 17 Ark. App. 131, 136, 705 S.W.2d 442 (1986) (depreciation in property value standing alone does not make the activity constitute a nuisance which should be abated or which can form the basis of an award of damages); *Koll-Irvine Center Property Owners Assn. v. County of Orange*, 24 Cal. App. 4th 1036, 1043, 29 Cal. Rptr. 2d 664 (1994) (decline in property value alone without interference in actual property right does not support a claim of private nuisance); *City of Louisville v. Munro*, 475 S.W.2d 479, 482-83 (Ky. 1971) (sole claim of diminished property value will not support private nuisance or reverse condemnation; a nuisance must disturb physical comfort or be offensive to physical senses); *Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 311, 487 N.W.2d 715 (1992) (allegation of property depreciation alone does not set forth a cognizable claim in nuisance, *i.e.*, not a significant interference with use and enjoyment of the property; but recognizing that property depreciation is a traditional *element of damages* in a nuisance action); *Leaf River Forest Products v. Ferguson*, 662 So. 2d 648, 663 (Miss. 1995) (common law does not allow recovery for a decrease in property value caused by public perception without accompanying physical harm to the property);

*Twitty v. State*, 85 N.C. App. 42, 53-54, 354 S.E.2d 296, *rev. denied* 320 N.C. 177 (1987) (private nuisance is more than threat of contamination; threat must amount to substantial interference with use of the property, mere diminution in value is not enough); *Golen v. Union Corp.*, 718 A.2d 298, 300 (Pa. Super. 1998) (alienability and diminution in value are relevant to calculate damages but are not cognizable injuries of themselves); *Walker Drug Co., Inc. v. La Sal Oil Co*, 972 P.2d 1238, 1244 (Utah 1998) (inability to use property as collateral to secure a mortgage loan because of fears arising from contamination of adjacent properties not sufficient as a matter of law to support a nuisance claim, *i.e.*, not a substantial and significant interference with landowners' use of the property); and *Edgcomb v. Lower Valley Power & Light*, 922 P.2d 850, 860 (Wyo. 1996) (trial court correctly ruled that diminution of value of the property, as a matter of law, is not interference with the use of property in a claim for nuisance).

The plaintiff class does not directly address the question of whether a diminution in a property's market value constitutes an interference with the owner's use and enjoyment of the property, *i.e.*, whether the property devaluation is the nuisance. However, the class intimates that stigma damages are both the injury and the measure of damages. Such an argument merges the cause and effect, *i.e.*, the cause of plaintiff's injury was a diminution in property value which effected a diminution in property value. We perceive such an argument to be circular and inappropriate.

Furthermore, the plaintiff class did not establish an impairment to the alienability of the class real property. Even the anecdotal witnesses confirmed that the real property was still marketable. At most, the evidence suggested that some class members were unable to sell their property for as much money as they would have liked.

Thus, we hold that to maintain an action for nuisance, a landowner must establish an interference with the owner's use and enjoyment of the property which is separate and distinct from the claim that the property's value has diminished because of marketplace fear or stigma.

### Negligence

At oral argument, counsel for the plaintiff class acknowledged the weight of authority requires an interference with the use and enjoyment of property to sustain a private nuisance, but reminded the court of plaintiffs' "general negligence" cause of action. As previously noted, plaintiffs have but one theory of liability; changing the label on the cause of action will not change the result.

Plaintiffs essentially claim that defendants' negligence created an environment in which the emotions of the buying public distressed the market value of their property. In other words, the claim is for a negligent infliction of emotional distress on the real property. Ironically, if the class members were to claim a negligent infliction of emotional distress upon their persons, our case law is clear that the action would have to be accompanied by an immediate physical injury directly and proximately caused by the negligent conduct. See, *e.g., Curts v. Dillard's, Inc.*, 30 Kan. App. 2d 814, 815, 48 P.3d 681 (2002). The only exception to that rule is where the defendant's acts were willful or wanton. 30 Kan. App. 2d at 815.

We see no reason to apply a different rule to property claims than is applied to personal injury claims. In order to recover for the diminution in value of real property resulting from the marketplace fear or stigma alleged to have been created by a defendant's negligence, the plaintiff must establish that the property sustained a physical injury as a direct and proximate result of the negligent conduct. Here, the plaintiff class did not meet that burden, and the district court should have granted the defendants' motion for judgment as a matter of law.

### OTHER ISSUES

A detailed discussion of appellants' other issues is unnecessary, given our foregoing holding. However, we find them to be without merit.

#### Evidence of Permanent Damages

Appellants claim the damages sought were not permanent damages. However, in their brief, appellants concede that "[l]oss of

market value is permanent loss" and that Dr. Simons opined that the loss of market value in this case was a permanent loss. Thus, we decline appellants' invitation to reweigh the evidence. See *State v. Lopez*, 36 Kan. App. 2d 723, Syl. ¶ 4, 143 P.3d 695 (2006).

*Class Representatives*

Appellants complain that the class representatives did not testify, albeit their precise argument is rather obtuse. What is clear is that the appellants did not appeal the class certification. As the plaintiff class points out, the plaintiffs' burden was to prove class-wide damages, not the individual claims of the class representatives. Appellants' citation to class action lawsuits seeking declaratory and injunctive relief, where the equitable remedy must be fashioned to the particular inadequacy found, are simply inapplicable to this case.

*Dr. Simons' Credibility*

Finally, appellants contend that plaintiffs' expert's methodologies were flawed and based upon guesses, assumptions, and mere speculation. The complaints about Dr. Simons' testimony simply invite us to assess his credibility. "Despite some evidence casting doubt on the credibility of key witnesses, we simply do not reweigh such evidence or redetermine the credibility of witnesses." *Lopez*, 36 Kan. App. 2d 723, Syl. ¶ 4. Further, we would note that the defendants' own expert confirmed that the hedonic regression analysis utilized by Dr. Simons is a recognized method of mass appraisal.

*CROSS-APPEAL*

Likewise, our reversal renders the cross-appeal moot. The plaintiff class does not contend that the anecdotal witnesses were limited in any manner in giving their testimony, *i.e.*, that they had anything more to say. The complaint is that the jury was instructed that the individual testimony could not be considered as being the common or typical experience of all Reno County residential landowners.

Interestingly, a review of the trial transcript reveals that the witnesses' experiences were not even common or typical with each other; some even specifically testified that their individual experi-

ence or their individual property was unique. It would be difficult to find that the limiting instruction told the jury anything that it could not perceive from listening to the actual testimony, *i.e.*, that the anecdotal personal experience of each lay witness could not be characterized as common or typical of other Reno County residential landowners.

Furthermore, as the plaintiff class strenuously argues in the issue on the failure of class representatives to testify, plaintiffs' burden was to prove class-wide damages. That burden cannot be accomplished by putting on an individual witness and then arguing that the jury can calculate the class damages by multiplying the individual damages by the number of people in the class. The jury simply could not calculate total, class-wide damages from the anecdotal testimony of the lay witnesses; that was the function of Dr. Simons' testimony. Thus, the district court's instruction to the jury did not mislead the jurors as to the law or the facts of this case.

Reversed and remanded with instructions to enter judgment as a matter of law in favor of the defendants.